IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| KATRINA M. HYCH, | ) | CASE NO. 3:14-cv-00069 |
| | ) | |
| Plaintiff, | ) | JUDGE JACK ZOUHARY |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Katrina M. Hych ("Plaintiff" or "Hych") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Commissioner") denying her

applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income

("SSI").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has

been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to

Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the Commissioner's

decision be **AFFIRMED**.

## I.  Procedural History

Hych filed applications for DIB and SSI on October 21, 2010.  Tr. 22, 149, 156.  She

alleged a disability onset date of August 12, 2009.  Tr. 22, 149, 156.  She alleged disability due

to cervical and lumbar injury, degenerative disc disease in cervical area, pain in both legs,

fibromyalgia, vertigo, carpal tunnel syndrome, and mental health impairments.  Tr. 70, 80-8,

106, 116.  After initial denial by the state agency (Tr. 106-112) and denial upon reconsideration (Tr. 116-129), Hych requested a hearing (Tr. 130-131).  A hearing was held before Administrative Law Judge Melissa Warner ("ALJ") on May 7, 2012.  Tr. 38-64.

In her May 15, 2012, decision, the ALJ determined that Hych had not been under a disability from August 12, 2009, through the date of the decision.  Tr. 19-37.  Hych requested review of the ALJ's decision by the Appeals Council.  Tr. 15-17.  As part of her request for review by the Appeals Council, Hych submitted additional evidence.  Tr. 4.  On November 14, 2013, the Appeals Council denied Hych's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-6.

## II. Evidence[1]

### A.    Personal, educational, and vocational evidence

Hych was born in 1965.  Tr. 149, 156.  She was 46 years old at the time of hearing.  Tr. 42.  She is single.  Tr. 42.  She has one adult daughter and granddaughter.  Tr. 504.  At the time of the hearing, Hych had been living by herself in a house for approximately one year.  Tr. 42-43.  She completed high school and received a two-year associate degree in law enforcement. Tr. 43.   Hych had not worked since her August 2009 work injury.  Tr. 44.  Prior to August 2009, Hych worked part-time at an office cleaning job as well as full-time in a glass production factory.  Tr. 44-45.  She had worked at the glass factory since 2007.  Tr. 45.  Prior to 2007, Hych worked at a different factory for about two years and, prior to that, she worked in a bread factory.

---

[1] Hych presented evidence to the Appeals Council that was not before the ALJ, including functional capacities evaluations.  Tr. 4, 610-639.  As discussed more fully below, in reviewing the Commissioner's final decision to determine whether there is substantial evidence to support the decision, where the Appeals Council denies review, the Court may not consider evidence presented to the Appeals Council but not the ALJ.  Here, the Appeals Council denied review.  Additionally, Hych has not requested a sentence six remand under 42 U.S.C. § 405(g).  Thus, evidence in the record that was not before the ALJ is not included in the summary of evidence.

Tr. 45.   In the mid-1990s, while Hych was working at the bread factory, she was also working for a telemarketing company where she performed office-type work.  Tr. 46-47.

**B.     Medical evidence**

### 1.     Physical impairments

*Treatment history*

On August 12, 2009, Hych slipped and fell on a wet floor at work.  Tr. 248, 311.  When she fell, she hit the back of her head.  Tr. 248.  On August 12, 2009, Hych presented to the Toledo Hospital Emergency Room with complaints of headaches, ankle pain and neck pain.  Tr. 248.  She was admitted and treated for her injuries.  Tr.  248-283.  Radiological tests of Hych's cervical area were obtained and showed early degenerative changes of the mid-cervical spine, osteoarthritis primarily at C5-6 without evidence of fracture or spondylolisthesis, some end plate spurring and marginal sclerosis but no fracture or subluxation.  Tr. 246, 259, 261-262, 270-271.  Radiological tests of Hych's ankle were normal.  Tr. 264.  Radiological tests of Hych's thoracic spine were negative (Tr. 267) and tests of her lumbar spine were essentially unremarkable (Tr. 269).  A CT scan of Hych's brain was performed showing a tiny hyperdensity, which the radiologist indicated could represent a bleed near the frontal area.  Tr. 248, 265-266, 268.  On reassessment by the emergency room physician, Hych was still reporting pain in the right front near her temple and in the back of her head.  Tr. 248.  Although there was no mass effect on her CT, because Hych was still having headaches, the emergency room physician obtained a trauma consult and the trauma team recommended that Hych be admitted.  Tr. 248. She was referred to a neurosurgeon, Dr. Hoefflinger.  Tr. 257, 313.  Dr. Hoefflinger diagnosed her with a lumbar and cervical sprain and recommended physical therapy.  Tr. 313.  She was discharged home on August 13, 2009.  Tr. 277.

3

On August 25, 2009, Hych saw Dr. Rashmi Goyal, M.D., of the University of Toledo Medical Center.  Tr. 313-314.  She reported that, because she did not require surgical intervention, Dr. Hoefflinger was unable to authorize time off from work to complete physical therapy.  Tr. 313.  Hych reported still being in a lot of pain.  Tr. 313.  She was taking a steroid pack, Zanaflex and hydrocodone.  Tr. 313.  To treat her muscle spasm, Dr. Goyal recommended that Hych continue with the steroid pack, pain medication, and Zanaflex.  Tr. 314.  He also discussed taking Aleve, as necessary, twice each day.  Tr. 314.  He recommended she proceed with the physical therapy and use heat packs.  Tr. 314.  He provided her with an off work authorization for 3 weeks.  Tr. 314.

On September 3, 2009, on referral from Dr. Goyal, Hych saw Dr. Nabil Ebraheim, M.D., in the Department of Orthopedics of the University of Toledo Medical Center.  Tr. 311-312.  Hych reported being in physical therapy but having no significant improvement.  Tr. 311.  Dr. Ebraheim's examination of Hych's cervical spine did not reveal any significant midline tenderness but Hych did have some tenderness to palpation at her bilateral paraspinal muscle area, left worse than right.  Tr. 311.  Dr. Ebraheim's examination of Hych's lumbar spine did reveal tenderness to palpation in the midline as well as left paraspinal muscle region.  Tr. 311.  Hych also had point tenderness over both SI joints and a positive Faber test bilaterally.  Tr. 311.  Otherwise, Dr. Ebraheim indicated that Hych was neurovascularly intact distally with no focal deficits appreciated.  Tr. 311.  Dr. Ebraheim assessed cervical and lumbar sprain.  Tr. 311.  For her neck, Dr. Ebraheim administered three trigger point injections and recommended submitting a C9 diagnosis for lumbar sprain so that they could possibly try therapeutic lumbar injections as well.  Tr. 311. Hych was provided a prescription for Motrin and an off work authorization for another week.  Tr. 311.

4

Hych continued to be treated by Dr. Ebraheim.  Tr. 460.  On December 10, 2009, Dr. Ebraheim indicated that workers compensation had denied the C9 for physical therapy as well as a pain management consult.  Tr. 460.  Dr. Ebraheim assessed Hych with bilateral sacroiliitis, the right worse than the left.  Tr. 460.  Dr. Ebraheim indicated that conservative treatment could help Hych return to work so they planned to submit a C9 for ultrasound guided injection to the bilateral SI joints and to re-submit a C9 for physical therapy.  Tr. 460.  An off work authorization from December 10, 2009, to January 31, 2010, until therapy could be approved was signed.  Tr. 426.

On January 21, 2010, Hych saw Dr. Ebraheim and her main complaint was neck pain bilaterally.  Tr. 459.  She had had trigger point injections and injections for her bilateral sacroiliitis.  Tr. 459.  The request for ultrasound guided injections had been disallowed.  Tr. 459.  Rather than submit a C9 for ultrasound guided injections, Dr. Ebraheim recommended that they submit a C9 for trigger point injections and he prescribed Flexeril.  Tr. 459.  Hych saw Dr. Ebraheim on February 8, 2010.  Tr. 457.  Her request for trigger point injections had not been approved.  Tr. 457.  Dr. Ebraheim indicated that Hych was going to start therapy the following day and he would see her back in six weeks.  Tr. 457.  Also, on February 8, 2010, Hych was seen at the emergency room reporting that she had been seen by Dr. Ebraheim that day and he gave her Flexeril and Ultram but it was not helping and she could not walk because of the pain.  Tr. 451-455.  She was prescribed cortisone and narcotics.  Tr. 454.

On March 15, 2010, Hych saw Dr. Ebraheim.  Tr. 372.  Dr. Ebraheim noted that they were still awaiting approval for trigger point injections and possible ultrasound guided injections to bilateral sacroiliac joints.  Tr. 372.  He noted he would see her back in six weeks.  Tr. 372.  On

that same date, an off work authorization from March 31, 2010, to April 31, 2010, based on diagnoses of cervical strain, lumbar strain, and bilateral sacroilitis.  Tr. 434.

Hych attended physical therapy.  Tr. 374-381.  However, on June 1, 2010, she was discharged from physical therapy because of non-attendance.  Tr. 382.

On July 29, 2010, Dr. Tallat Rizk, M.D., of the Physical Medicine and Rehabilitation Department of the University of Toledo Medical Center, administered trigger point injections for her neck.  Tr. 407.  With respect to her lumbar sprain, Dr. Rizk recommended therapeutic exercises and TENS and ultrasound 2 to 3 times for 4 to 6 weeks.  Tr. 407.  Hych saw Dr. Rizk on August 5, 2010.  Tr. 406.  He felt that Hych had failed almost all conservative treatment and indicated that he would be requesting an MRI of her cervical spine and lumbar spine.  Tr. 406.

As of September 30, 2010, Hych's request for a cervical MRI had been approved and the MRI at the C4-C5 level showed a broad based osteocytic bulge with some very mild right-sided neural foraminal stenosis but no evidence of any severe diskogenic herniation or bulge.  Tr. 401. Dr. Rizk concluded that Hych's clinical symptoms at that time were degenerative changes in her cervical spine and were likely not related to her fall at work.  Tr. 401.  He recommended continuation of her home therapy program and over-the-counter pain medication.  Tr. 401.  He discussed with her the possibility of performing an epidural injection at the C4-C5 level but indicated that it would not be covered under workers compensation because he did not believe that the issues were related to her work injury. Tr. 401.

On November 21, 2010, Hych presented to the emergency room with complaints of pain. Tr. 393-400.  She was treated and diagnosed with headache, back and neck pain but she left the emergency room without receiving prescriptions and follow-up instructions.  Tr. 395.  Hych last saw Dr. Rizk on December 16, 2010, during which time he reiterated his opinion that the

cervical MRI findings showed degenerative changes and he did not believe that they were related to her work injury.  Tr. 480.  Hych noted that she had seen a chiropractor regarding her neck but the request for chiropractic treatment had been denied by workers compensation. Tr. 480.

On January 23, 2011, Hych presented again to the emergency room with complaints of neck and back pain.  Tr. 498-502.  The emergency room physician diagnosed neck/back pain and recommended that Hych follow up with her primary care physician or Dr. Rizk, her physical rehabilitation physician.  Tr. 501.

Due to a lack of medical insurance, Hych received treatment from a local free clinic Neighborhood Health Association/River East Community Health Center.  Tr. 535-539.  Dr. Nestor Zambrano, M.D., ordered a lumbar MRI which was performed on March 4, 2011.  Tr. 494-495.  Hych was referred to the pain management clinic at Mercy St. Vincent Medical Center and, on May 16, 2011, Dr. Ahmed Eltaki, M.D., of Mercy St. Vincent Medical Center saw Hych for a consultation.  Tr. 540-542.  Dr. Eltaki reviewed the lumbar MRI and indicated that it was a completely negative; the findings were very normal.  Tr. 540.  Dr. Eltaki indicated that he believed that Hych's pain could be musculoskeletal related rather than related to a herniated disk.  Tr. 541.  He recommended an electroceutical nerve block ("ENB") to help relax her muscles and improve the circulation to her muscles.  Tr. 541.  He noted that Hych was showing signs of depression during his consultation and suggested that it might be helpful for her to see a psychologist or psychiatrist.  Tr. 541.  In May and June 2011, Hych underwent a series of ENBs (Tr. 520-529) but, at the conclusion of the treatment, she reported only receiving about 2 hours of relief following an ENB (Tr. 528).  Subsequently, in July 2011, Dr. Damodar Reddy, M.D., of Mercy St. Vincent Medical Center administered two caudal epidural steroid blocks.  Tr. 533-534,

543-544.  Hych continued to see medical professionals at Mercy St. Vincent Medical Center through 2011 and into 2012.  Tr. 545-557.

*Opinion evidence*

On December 20, 2010, state agency reviewing physician Dr. W. Jerry McCloud, M.D., reviewed the records and completed a Physical RFC Assessment opining that Hych could occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; stand and/or walk about 6 hours in an 8-hour workday; sit more than 6 hours on a sustained basis in an 8-hour workday; and push and/or pull without limitation, other than as indicated for lift and/or carry. Tr. 74.  He also opined that Hych could never climb ladders, ropes or scaffolds and could only crawl occasionally because of mild C-spine DDD, history of vertigo, and reports of significant pain in her neck and shoulder.  Tr. 74-75.  Dr. McCloud also opined that Hych should avoid all exposure to hazards (machinery, heights, etc.) due to a history of vertigo and significant pain complaints.  Tr. 75.

On reconsideration, on April 5, 2011, state agency reviewing physician Teresita Cruz, M.D., reviewed the records and considered Hych's allegations of worsening condition and affirmed Dr. McCloud's Physical RFC Assessment as written.  Tr. 98-100.  In offering her opinion, Dr. Cruz indicated that Hych's condition had not changed/worsened and a recent MRI/XR indicated unremarkable findings in the lumbar spine and the cervical spine findings were unchanged.  Tr. 100.

## 2. Mental impairments

*Treatment history*

On November 12, 2009, Hych underwent a psychiatric consultation with resident Dr. Puneet Singla, M.D., at the University of Toledo Medical Center.[2]  Tr. 334-339.  Hych's depression had been present since her injury at work in August 2009.  Tr. 334.  She reported feelings of worthlessness and guilt as a result of her inability to work and function socially.  Tr. 334.  She had been taking Prozac prescribed by her primary care physician.  Tr. 334.  Dr. Singla diagnosed Hych with adjustment disorder with depressed mood; rule out major depressive disorder, mild-moderate and assessed a GAF score of 60-65.[3]  Tr. 339.  Upon consultation with Dr. Rapport, Dr. Singla recommended that Hych resume taking Prozac and made a referral to the outpatient clinic.  Tr. 339.  Hych did not follow up with the University of Toledo Medical Center's outpatient clinic.

In February 2011, upon a referral by her attorney, Hych saw psychologist Dr. Daniel Kuna, Ph.D., twice in order for Dr. Kuna to assess: (1) whether Hych suffered from a psychological condition; and (2) if yes, whether her psychological condition was directly and causally related to her work injury.  Tr. 503-505.  In a March 7, 2011, letter to Hych's counsel, Dr. Kuna reported his conclusions (Tr. 503-505) indicating that Hych's "[u]nremitting,

---

[2] The attending physician was Daniel J. Rapport, M.D.  Tr. 334, 339.

[3] GAF Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision.  Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34.  A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  *Id.*  A GAF score between 61 and 70 indicates "some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  *Id.*

moderate, low back pain and resulting limitations have caused a major depressive episode . . . [that] . . . is directly and causally related to the industrial injury." Tr. 505.  He noted that Hych's primary care physician had started her on Prozac.  Tr. 505.

On August 31, 2011, Hych was evaluated by medical professionals at Harbor. Tr. 600-604.  Hych was diagnosed with major depression, single episode and assessed a GAF score of 50-55.[4]  Tr. 604.  She was started on Cymbalta.  Tr. 604.  Hych continued treatment at Harbor from August 2011 through March 2012. Tr. 558-599.  In addition to the Cymbalta, additional medications, including Abilify and Trazodone, were prescribed.  Tr. 586.  In October 2011, Harbor medical professionals assessed Hych with a GAF score of 63 (Tr. 578) and, in December 2011, a GAF score of 50 (Tr. 586).

*Opinion evidence*

On April 8, 2011, state agency reviewing psychologist Caroline Lewin, Ph.D., reviewed the record and completed a Psychiatric Review Technique (Tr. 96-97) and Mental RFC Assessment (Tr. 100-101).  In the Psychiatric Review Technique, Dr. Lewin opined that Hych had mild restrictions in activities of daily living, no difficulties in social functioning, moderate difficulties in concentration, persistence or pace, and no episodes of decompensation.  Tr. 97.  In assessing Hych's mental RFC, Dr. Lewin opined that Hych had moderate limitations in her ability to understand and remember detailed instructions but she was capable of performing simple, routine tasks.  Tr. 100.  Dr. Lewin opined that Hych had moderate limitations in her ability to carry out detailed instructions and maintain attention and concentration for extended periods but she was capable of completing tasks that were relatively static in nature.  Tr. 100-

---

[4] A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)."  *Id.*  A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  *Id.*

101.  She also opined that Hych had moderate limitations in her ability to respond appropriately to changes in the work setting but was capable of completing tasks in which changes were infrequent and could be explained.  Tr. 101.

On April 7, 2012, Dr. Kuna completed a Mental Impairment Questionnaire.  Tr. 605-609. With respect to the frequency and length of his contact with Hych, Dr. Kuna indicated "2/7/11 – 7/15/11 [-] 10 contact hrs."[5]  Tr. 605.  Dr. Kuna's diagnoses included major depressive disorder and he assessed a GAF score of 55.  Tr. 605.  He indicated that the signs and symptoms associated with his diagnoses included: poor memory, appetite disturbance with weight change, sleep disturbance, emotional lability, feelings of guilt/worthlessness, difficulty thinking or concentrating, social withdrawal or isolation, blunt, flat or inappropriate affect, decreased energy, and generalized persistent anxiety.  Tr. 605.  When asked to describe the clinical findings or results of mental status examinations that demonstrated the severity of Hych's symptoms Dr. Kuna stated, "see attached 3/7/11 report."  Tr. 605.  Dr. Kuna indicated that "treatment [had] stopped and transferred to agency" and, when asked to list Hych's medications, he noted "see Harbor reports."  Tr. 606.  Dr. Kuna noted that, in July, Hych's prognosis was fair.  Tr. 606.  He opined that, based on Hych's impairment, she would miss work 3 or more times per month.  Tr. 606.  In rating Hych's work related abilities in 25 categories, Dr. Kuna rated Hych's ability as either "fair"[6] or "poor to none."[7]  Tr. 607-608.  Dr. Kuna opined that Hych had moderate limitations/difficulties in activities of daily living and in maintaining social functioning and marked deficiencies in concentration, persistence or pace resulting in failure to complete tasks in

---

[5] Other than the February 7, 2011, and February 14, 2011, dates referenced in Dr. Kuna's March 7, 2011, letter (Tr. 503), there are no records from other evaluations or treatment by Dr. Kuna.

[6] Fair was defined in the Questionnaire as "ability to function in this area is seriously limited but not precluded."  Tr. 607.

[7] Poor or none was defined in the Questionnaire as "no useful ability to function in this area."  Tr. 607.

timely manner (in work setting or elsewhere).  Tr. 608.  He also opined that Hych had moderate limitations in episodes of deterioration or decompensation in work or work-like settings which cause her to withdraw from the situation or experience an exacerbation of sign and symptoms. Tr. 608.

## C.    Testimonial evidence

### 1.    Plaintiff's testimony

Hych testified at and was represented at the hearing.  Tr. 42-60.  She had not worked since she injured herself in August 2009.  Tr. 44.  Prior to her injury, Hych had been diagnosed with fibromyalgia which caused her pain and discomfort.  Tr. 55.  However, she was functioning with her fibromyalgia until the time of her injury.  Tr. 55.  She initially received workers compensation for her work related injury but those benefits ceased in October 2011.  Tr. 55.

When asked why she is unable to work, Hych indicated that she is unable to sit or stand for long periods of time, bend, squat or twist and turn.  Tr. 49.  She is able to sit for about 15 to 20 minutes and stand for about 15 to 20 minutes.  Tr. 49.  She can walk for about 2 to 3 blocks. Tr. 49.  Hych drove herself to the hearing but indicated that she has a difficult time driving because it bothers her to turn her shoulders and neck and sitting bothers her lower back.  Tr. 43. When asked what makes her pain and discomfort better, Hych indicated that physical therapy exercises helped some and sometimes she uses a heating pad or ice.  Tr. 53.  At night, she sleeps about 3 to 4 hours but her sleep is broken.  Tr. 53.  During the day, she lies down 1 to 2 times anywhere from 45 minutes to all day.  Tr. 53.  She will sometimes fall asleep during the day.  Tr. 53-54.  She can carry a gallon of milk in one hand but not in both hands.  Tr. 55-56.  She estimated being able to lift at most 10 pounds.  Tr. 56.  She can bend and touch her knees but she has difficulty touching the floor if she is standing upright.  Tr. 56.  She has stairs in her home

which she ambulates daily but has difficulty doing so because it hurts her legs and lower back. Tr. 56.  It is difficult for her to reach over her shoulder.  Tr. 56-57.  When doing so, it causes numbness and tingling down her arm.  Tr. 57.  Because of arthritis, Hych has a difficult time using her hands, including writing her name or picking up and opening her pill bottles.  Tr. 57, 58.

With respect to her mental health issues, Hych indicated she suffers from depression.  Tr. 54.  She indicated that she had been depressed for about 2 years.  Tr. 54.  She feels as if her quality of life has been taken away from her.  Tr. 54.  She feels like she is constantly under, rather than above, water.  Tr. 54.  Some days she feels that her medication helps.  Tr. 54.  She receives mental health treatment through Harbor and she feels that it helps.  Tr. 54.  She had to discontinue therapy sessions with a counselor because of a lack of medical coverage but she still continues to see a psychiatrist.  Tr. 54.

During the day, Hych tries to do perform her daily activities, including housework and laundry.  Tr. 51.  She described a typical day as: getting up, getting dressed, preparing breakfast or lunch depending on what time she wakes up, and trying to do housework.  Tr. 52.  Although she reported having a strong support system of family and friends she prefers not to see them because she feels as though her depression has consumed her soul and she feels like she is a burden to friends and family.[8]  Tr. 52.  She prefers to be alone.  Tr. 57.  She watches some television and reads but she is never able to finish what she is reading and feels as if the television is just staring at her.  Tr. 55.  She gets distracted and feels as if all her thoughts are running through her head.  Tr. 58.  She is able to take care of her personal needs such as showering, dressing and feeding herself.  Tr. 55.

---

[8] When testifying about feeling like she is a burden to others, Hych needed to take a break off the record for a few minutes.  Tr. 52.  Following a short break, Hych indicated to the ALJ that she was okay to proceed.  Tr. 53.

Hych takes a number of different medications, including Cymbalta, Abilify, Trazodone, and Tramadol. T r. 49-50.  Side effects from her medications include constipation and weight gain.  Tr. 50.  She also has headaches.  Tr. 50.  However, she indicated that she had headaches even prior to taking the medications.  Tr. 50.  Her headaches started after her work injury.  Tr. 51.  She has headaches 2 to 3 times each day and they last anywhere from about 30 minutes to all day.  Tr. 50.

### 2.    Vocational expert's testimony

Vocational Expert Joseph L. Thompson ("VE") testified at the hearing.  Tr. 58-63, 143-145.  The ALJ asked the VE to assume a hypothetical individual who can perform all functions of medium work except no climbing of ladders; frequent kneeling, crouching and crawling; no exposure to obvious hazards; work at an SVP of 1 to 2[9] where the pace of productivity is not dictated by an external source, such as an assembly line or conveyor belt; rare contact with the general public, rare meaning less than occasionally but not completely precluded and occasional contact with co-workers.  Tr. 60.  The ALJ then asked whether the described hypothetical individual would be able to perform Hych's past relevant work.  Tr. 60.  The VE indicated that such an individual would not be able to perform Hych's past relevant work[10].  Tr. 60.  The VE indicated there would be other medium, unskilled jobs available to such an individual, including (1) janitor with 30,000 positions available statewide and 450,000 nationwide; (2) dishwasher with 20,000 positions available statewide and 600,000 nationwide; and (3) groundskeeper with 5,000 statewide and 150,000 nationwide.  Tr. 61.

---

[9] SVP refers to the DOT's listing of a specific vocational preparation (SVP) time for each described occupation. Social Security Ruling No. 00-4p, 2000 SSR LEXIS 8, *7-8 (Social Sec. Admin.  December 4, 2000).   Using the skill level definitions in 20 CFR §§ 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2.  Id.

[10] The VE initially indicated that the described individual would be able to perform Hych's past janitorial work.  Tr. 60.  The ALJ, however, indicated that she did not consider Hych's janitorial work to be past relevant work because she did not perform it long enough.  Tr. 61.

The ALJ then asked the VE to assume the same hypothetical except with the individual having the ability to perform light as opposed to medium level work.  Tr. 61.  The VE indicated that there would be light, unskilled jobs available to such an individual, including (1) cleaner with 6,000 positions available statewide and 180,000 nationwide; (2) folder with 4,000 positions available statewide and 120,000 nationwide; and production inspector with 4,000 positions available statewide and 60,000 nationwide.  Tr. 61.  In response to further inquiry by the ALJ, the VE indicated that adding "occasional overhead or reaching at the shoulder height" to the hypothetical would not change his answers.  Tr. 61.  The VE also indicated that adding frequent handling of objects larger than the average coffee cup and occasional fingering would not affect the three light jobs he had identified.  Tr. 62.

The VE indicated that any time away from the workstation in excess of 20 percent of the workday would eliminate all employment.  Tr. 62.  He indicated that the ordinary tolerance for absenteeism is 1 to 2 days per month so that, if a person was consistently absent at that level, all employment would be eliminated and there would be no allowance for lying down during the course of a workday.  Tr. 62.

In response to Hych's counsel question to the VE, the VE indicated that adding to any of the ALJ's hypotheticals the additional limitations of no ability to maintain attention for two-hour segments and poor or no ability to work in coordination with or proximity to others, would result in the elimination of all productive work.  Tr. 63.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which

can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[11] *see also Bowen v. Yuckert,* 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of

---

[11] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20

proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir.

1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has

the Residual Functional Capacity ("RFC") and vocational factors to perform work available in

the national economy.  *Id.*

## IV. The ALJ's Decision

In her May 15, 2012, decision, the ALJ made the following findings:[12]

1.   Hych met the insured status requirements through December 31, 2014.
     Tr.  24.

2.   Hych had not engaged in substantial gainful activity since August 12,
     2009, the alleged onset date.  Tr. 24.

3.   Hych had severe impairments of cervical degenerative disk disease and
     degenerative joint disease of the spine; a history of fibromyalgia; and a
     major depressive disorder.  Tr. 24. Hych's vertigo, low back pain and
     problems with her hands were non-severe impairments.  Tr. 24-25.

4.   Hych did not have an impairment or combination of impairments that met
     or medically equaled the severity of one of the listed impairments,
     including Listings 1.02 (Major Dysfunction of a Joint), 1.04 (Disorders of
     the Spine) and 12.04 (Affective Disorders).  Tr. 25-27.

5.   Hych had the RFC to perform medium work except: never climb ladders,
     ropes, or scaffolds; frequently kneel, crouch, or crawl; no exposure to
     hazards such as machinery and unprotected heights; work with an SVP of
     1 to 2, where the pace of productivity is not dictated by an external
     source over which the claimant has no control, such as an assembly line
     or conveyor belt; rare, defined as less than occasional but not completely
     precluded, contact with the general public; and occasional contact with
     co-workers.  Tr. 27-31.

6.   Hych had no past relevant work.  Tr. 31.

7.   Hych was born in 1965 and was 43 years old, defined as a younger
     individual age 18-49, on the alleged disability onset date.  Tr. 31.

---

C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to
the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

[12] The ALJ's findings are summarized.

8.      Hych had at least a high school education and was able to communicate
        in English.  Tr. 31.

9.      Transferability of job skills was not an issue because Hych did not have
        past relevant work.  Tr. 31.

10.     Considering Hych's age, education, work experience and RFC, there
        were jobs that existed in significant numbers in the national economy that
        Hych could perform, including janitor, dishwasher, and groundskeeper.
        Tr. 31-32.

Based on the foregoing, the ALJ determined that Hych had not been under a disability

from August 12, 2009, through the date of the decision.  Tr. 32.

## V. Parties' Arguments

### A.      Plaintiff's arguments

Hych presents five arguments.  First, Hych argues that the ALJ failed to provide good

reasons for rejecting the opinion of her treating psychologist Dr. Daniel Kuna, Ph.D.[13]  Doc. 15,

pp. 11-12, Doc. 18, pp. 1-4.   Second, Hych argues that the ALJ erred in finding that Hych's low

back pain was not a severe impairment.  Doc. 15, pp. 13-14, Doc. 18, p. 4.

Third, Hych argues that the ALJ's determination that Hych had the RFC to perform

medium work was not supported by substantial evidence.  Doc. 15, pp. 14-15.  She contends that

the ALJ improperly provided great weight to opinions of non-examining physicians who had not

had the opportunity to review all the medical records.  Doc. 15, pp. 14-15.  Further, Hych argues

that her treating doctors at the University of Toledo Medical Center never indicated that Hych

could perform medium work.  Doc. 15, p. 15.

Fourth, Hych argues that the ALJ's hypothetical question to the VE did not contain a

complete and accurate summary of Hych's mental health limitations.  Doc. 15, pp. 16-17, Doc.

---

[13] She also argues that the Appeals Council claimed to have reviewed additional treating physician reports, including
records from Dr. Mark Neumann, D.O., who Hych asserts was a treating physician, but the Appeals Council
provided no analysis of Dr. Neumann's opinion.  Doc. 15, pp. 12-13.

18, pp. 4-5.  She contends that the hypothetical was very general and, except for one "quasi mental health restriction," i.e., "rare contact with the general public; rare meaning less than occasionally but not completely precluded and occasional contact with coworkers," failed to account for any mental health limitations.  Doc. 15, p. 16.  She argues that the ALJ did not account for non-examining state agency psychologist Dr. Lewin's opinion that Hych would have "moderate limitations in the ability to understand and remember detailed instructions, moderate limitations in the ability to maintain attention and concentration for extended periods, and moderate limitations in the ability to respond appropriately to changes in the work setting" or Dr. Kuna's restrictions such as an inability to maintain attention for a two hour segment or an inability to perform at a consistent pace without an unreasonable number and length of rest periods.  Doc. 15, p. 16, Doc. 18, pp. 4-5.

Fifth, Hych contends that reversal and remand is warranted because new evidence presented to the Appeals Council demonstrates that Hych was unable to perform work even at the sedentary level and/or when the entire record is reviewed, substantial evidence does not support the ALJ's decision.  Doc. 15, pp. 17-18, Doc. 18, pp. 5-6.  In arguing that the decision is not supported by substantial evidence, Hych states that the ALJ did not mention her epidural blocks and incorrectly found that she had no past relevant work.  Doc. 15, pp. 17-18, Doc. 18, pp. 5-6.  She also argues that the ALJ improperly rejected her treating psychologist's opinion and gave great weight to the non-examining state agency reviewing psychologist's opinion who had limited records upon which to base her opinion.  Doc. 15, p. 17.

**B.    Defendant's arguments**

First, in response, the Commissioner argues that the ALJ specifically addressed Dr. Kuna's April 7, 2012, opinion and the record supports her evaluation of that opinion.  Doc. 17,

pp. 9-11.  The Commissioner notes that, although Dr. Kuna's opinion indicates that he saw Hych for about 10 visits between February and July 2011, the record contains only a record dated March of 2011 wherein Dr. Kuna indicated that he had only seen Hych twice (in February 2011).  Doc. 17, p. 9 (referencing Tr. 503-505).

Second, the Commissioner argues that the ALJ's finding that Hych's back pain was not a severe impairment was proper.  Doc. 17, pp. 11-12.  She contends that Hych failed to present objective evidence demonstrating a severe impairment and Hych's diagnoses of low back pain were based solely on her complaints of pain.  Doc. 17, pp. 11-12.

Third, the Commissioner argues that substantial evidence supports the ALJ's finding that Hych could perform medium work.  Doc. 17, pp. 12-13.  To the extent that Hych claims that the ALJ improperly weighed the opinions of the non-examining state agency physicians because they did not review medical evidence from Dr. Neumann or a FCE testing from an occupational therapist, the Commissioner contends that that evidence was not before the ALJ.  Doc. 17, pp. 12-13.  Therefore, the Commissioner contends that it is not proper for this Court to consider that evidence when determining whether the ALJ's decision is supported by substantial evidence.  Doc. 17, pp. 12-13.  With respect to Hych's claim that her treating physicians never indicated she could perform medium work, the Commissioner notes that they also never restricted her to less than medium work for any significant period of time.  Doc. 17, p. 13 (recognizing that Dr. Ebraheim of the University of Toledo Medical Center had limited Hych's activities for two short periods, i.e., December 10, 2009, to January 31, 2010, and March 31, 2010, to April 31, 2010 (Tr. 426, 434)).  Further, the Commissioner notes that the non-examining state agency physicians had reviewed records from Dr. Ebraheim.  Doc. 17, p. 13.

Fourth, the Commissioner argues that the ALJ's hypothetical question to the VE accurately reflected those mental health limitations that the ALJ found to be supported by the record.  Doc. 17, pp. 13-14.  The Commissioner indicates that the ALJ did not err in not including Dr. Kuna's limitations in the hypothetical question to the VE because the ALJ reasonably gave little weight to his opinion.  Doc. 17, p. 13.  Further, the Commissioner argues that Hych incorrectly argues that the only quasi mental health limitations included in the hypothetical related to contact with others.  Doc. 17, pp. 13-14.   The Commissioner points out that the ALJ also included a restriction that limited the hypothetical individual to work at an SVP 1 to 2 level, where the pace of productivity is not limited by an external source.  Doc. 17, pp. 13-14 (referencing Tr. 60).  Thus, the Commissioner contends that the ALJ properly accounted for Hych's mental limitations, including those as found by Dr. Lewin.  Doc. 17, pp. 13-14.

Fifth, the Commissioner argues that additional evidence presented to the Appeals Council does not require remand because Hych does not argue grounds for a remand under sentence six of 42 U.S.C. § 405(g).  Doc. 17, pp. 7-8, 14.  Further, the Commissioner argues that the evidence presented to the Appeals Council but not before the ALJ cannot be considered by the Court when assessing whether the decision is supported by substantial evidence.  Doc. 17, pp. 7-8, 14. Also, while the Commissioner does not concede that the ALJ's failure to mention Hych's epidural blocks and/or the ALJ's statement that Hych had no past relevant work was error, the Commissioner argues that, even if error, Hych has not shown the error to be harmful.  Doc. 17, p. 14.  Thus, the Commissioner asserts that Hych has failed to demonstrate that the ALJ's decision is not supported by substantial evidence.  Doc. 17, p. 14.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

## A.    The ALJ properly considered the April 7, 2012, opinion of psychologist Daniel J. Kuna, Ph.D.

Hych argues that the ALJ violated the treating physician rule when considering and weighing the April 7, 2012, opinion of psychologist Daniel J. Kuna, Ph.D.  Doc. 15, pp. 11-13, Doc. 18, pp. 1-4.  Hych also argues that reversal and remand is warranted because no analysis

was made with respect to the opinion of her treating physician Dr. Mark Neumann, D.O.  Doc. 15, pp. 12-13.

The Social Security Administration's Regulations provide rules regarding how to weigh "medical opinions."  20 C.F.R. § 404.1527(d).  As noted in the Regulations, "medical opinions" are statements from acceptable medical sources that reflect judgments about the nature and severity of a claimant's impairments, including symptoms, diagnosis and prognosis, what a claimant can still do despite his or her impairments, and a claimant's physical or mental restrictions.  20 C.F.R. § 404.1527(a)(2).

When applying the Regulations relating to how the Commissioner shall weigh medical opinions, the Sixth Circuit has stated that "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record."[14] *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6the Cir. 2004); 20 C.F.R. § 404.1527(d)(2).

A treating source is an acceptable medical source who provides, or has provided, a claimant with medical treatment or evaluation and who has had an ongoing treatment relationship with the claimant.  20 C.F.R. § 404.1502.  The Commissioner will generally consider there to be an "ongoing treatment relationship" when the medical evidence establishes that a claimant is or has been seen with a frequency consistent with accepted medical practice for the type of treatment or evaluation required for a claimant's medical condition.  *Id.*  If a physician has treated a claimant only a few times or after long intervals, the Commissioner may

---

[14] If a treating source's opinion is not provided controlling weight, certain factors are to be applied by the ALJ to determine what weight should be given to the treating source's opinion.  *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007).  The factors to be considered are: (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors which tend to support or contradict the opinion.  *Bowen*, 478 F.3d at 747; 20 C.F.R. § 404.1527(d).

consider that physician to be a treating source if the nature and frequency of the treatment or evaluation is typical for the claimant's condition.  *Id.*  If the relationship with the acceptable medical source is not based on the claimant's medical need for treatment or evaluation but, rather, solely on the need to obtain a report in support of a disability claim, that medical source will not be considered to be a treating source.  *Id.*  In those instances where a physician is not a treating source, analysis under *Wilson* is not required.  *See Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007); *Daniels v. Comm'r of Soc. Sec.*, 152 Fed. Appx. 485, 490-491 (6th Cir. 2005).

### *Dr. Kuna*

Although Hych claims that Dr. Kuna was her treating psychologist and therefore the ALJ's analysis of Dr. Kuna's April 7, 2012, opinion rendered in the Mental Impairment Questionnaire was deficient under the treating physician rule, as discussed more fully below, the record does not support application of the treating physician rule.

Although not dispositive, the ALJ did not refer to Dr. Kuna as a treating psychologist. Rather, when discussing Dr. Kuna's records, the ALJ correctly indicated that Dr. Kuna saw Hych in 2011 to complete a psychological independent medical examination.  Tr. 29, 503-505.  In his March 7, 2011, report, Dr. Kuna indicated that he saw Hych based on a referral from her attorney to determine whether Hych suffered from a psychological condition and, if so, whether her psychological condition was directly and causally related to her work injury.  Tr. 503.  Further, although Dr. Kuna's March 2011 report reflects that Dr. Kuna saw or evaluated Hych on February 7, 2011, and February 14, 2011 (Tr. 503), other than the March 7, 2011, report, there are no separate treatment or evaluation records from those February 2011 evaluations. Additionally, although Dr. Kuna indicated in the April 7, 2012, Mental Impairment

Questionnaire that the "frequency and length of contact" with Hych was "2/7/11 – 7/15/11 [-] 10 contact hrs." (Tr. 605) Hych has not presented treatment records from Dr. Kuna for February 2011 nor for any other dates through July 2011.[15]  Further, Dr. Kuna cited only to his March 7, 2011, report when asked to describe the clinical findings that demonstrated the severity of Hych's mental impairment and symptoms.  Tr. 605.

Also, the records do not demonstrate that Dr. Kuna actually treated Hych.  For example, Dr. Kuna notes that Hych's primary care physician had prescribed Prozac, however, he does not indicate that he himself prescribed medication for Hych.  Tr. 505.  Also, when completing the April 7 2012, Mental Impairment Questionnaire, in response to a question asking for a list of Hych's medications, Dr. Kuna responded, "see Harbor reports."  Tr. 606.

As shown above, although Dr. Kuna may have seen or evaluated Hych, the nature of Dr. Kuna's treatment or evaluation of Hych are not indicative of an ongoing treatment relationship. 20 C.F.R. § 404.1502.  It appears that Dr. Kuna's relationship with Hych was, as found by the ALJ, for the purpose of conducting an independent medical examination, not for the purpose of establishing an ongoing treatment relationship.  Tr. 29, 503-505.  By comparison, Hych received regular treatment from Harbor and there were detailed treatment and medication management records.  Tr. 558-604.  Further, that independent medical examination appears to have been conducted to support her workers compensation claim rather than based on a need for treatment.

Based on the foregoing, because Hych's relationship with Dr. Kuna did not rise to the level of an ongoing treatment relationship, Hych's treating physician arguments are misplaced and Hych is unable to demonstrate a violation of the treating physician rule.  *See Smith*, 482 F.3d at 876; *Daniels*, 152 Fed. Appx.  at 490-491.

---

[15] An initial psychiatric evaluation conducted by Harbor on August 31, 2011, notes that Hych's past treatment included outpatient treatment by Daniel Kuna Ph.D. beginning last winter but does not further discuss the length or type of treatment.  Tr. 600.

Moreover, although Dr. Kuna's opinion was not subject to the treating physician rule, the ALJ considered and explained the weight provided to Dr. Kuna's April 7, 2012, opinion, giving little weight to that opinion because the ALJ found it to be inconsistent with the medical record as a whole.  Tr. 29, 30.   Hych contends that Dr. Kuna's opinion was not inconsistent with other mental health records.  Doc. 18, p. 2.  However, as noted by the ALJ, as part of his 2009 psychiatric consultation, Dr. Singla assessed a GAF score of 60-65 which was reflective of some mild symptoms.[16]  Tr. 29, 339.  The ALJ also discussed and considered treatment records from Harbor, noting that Hych had shown some improvement with medication.  Tr. 29, 573, 582.  Based on the foregoing, it cannot be said that the ALJ failed to consider and/or explain the weight provided to the medical opinion from Dr. Kuna.  Nor has Hych shown that the ALJ's decision is not supported by substantial evidence.

Accordingly, the undersigned recommends that the Court find Hych's arguments with respect to the ALJ's consideration of and weight provided to Dr. Kuna's opinion to be without merit.

### Dr. Neumann

Hych also argues that the Court should reverse the Commissioner's decision because a July 11, 2012, Physical Capacities Evaluation completed by Dr. Mark S. Neumann, D.O., who Hych asserts is a treating physician, was submitted to the Appeals Council but no analysis of his opinion was performed.  Doc. 15, pp. 12-13.  Hych's argument is without merit.

Dr. Neumann's July 11, 2012, opinion (Tr. 637-638), was rendered *after* the ALJ rendered her decision on May 12, 2012 (Tr. 19) and therefore cannot be considered when determining whether the ALJ's decision was supported by substantial evidence even though submitted to the Appeals Council.  Although the Appeals Council received and considered

---

[16] The ALJ referenced the top range of the GAF assessment, i.e., 65.  Tr. 29.

additional evidence submitted by Hych, including Dr. Neumann's Physical Capacities Evaluation (Tr. 4), the Appeals Council "denied . . . [Hych's] request for review" (Tr. 1) and found "that [the] . . . information [did] . . . not provide a basis for changing the Administrative Law Judge's decision." (Tr. 2).  Thus, this Court may not consider that evidence when determining whether the ALJ's decision was supported by substantial evidence.  *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996) ("[W]here the Appeals Council considers new evidence but declines to review a claimant's application for disability benefits on the merit, the district court cannot consider that new evidence in deciding whether to uphold, modify, or reverse the ALJ's decision.") (citing *Cotton v. Sullivan*, 2 F.3d 692, 695-696 (6th Cir. 1993).

Although the Court may not consider evidence that was not before the ALJ when determining whether the ALJ's decision was supported by substantial evidence, the Court may remand the matter pursuant to sentence six of 42 U.S.C. § 405(g) for consideration of new and material evidence if a claimant can demonstrate good cause for not presenting the evidence in the earlier proceeding.  *Cline*, 96 F.3d at 148.  However, Hych has not argued or presented a basis for a sentence six remand.  Since Hych has not developed an argument as to why a sentence six remand would be appropriate, such an argument is waived.  *McPherson v. Kelsey*, 125 F.3d 989, 995–996 (6th Cir. 1997) "Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." (internal citations omitted).

Accordingly, for the foregoing reasons, the undersigned recommends that the Court find Hych's treating physician argument with respect to Dr. Neumann without merit.

**B.** **The ALJ's Step Two determination is a not a basis for reversal and remand**

Hych argues that the ALJ erred in finding that Hych's low back pain was not a severe impairment.  Doc. 15, pp. 13-14, Doc. 18, p. 4.

In finding Hych's low back pain to be a non-severe impairment, the ALJ found that: "[o]ther than the fibromyalgia, the record does not contain radiologic or other evidence documenting an impairment corresponding to the complaints of low back pain so as to constitute a medically determinable impairment."  Tr. 25.  Hych indicates that, even though radiological tests did not show any compression fracture, disk herniation, or significant stenosis, her doctors had treated her and diagnosed her with lumbar spine problems.   Doc. 15, p. 13.  Thus, Hych argues that the ALJ improperly found her low back pain to be a non-severe impairment and she improperly ignored her low back pain in assessing Hych with the RFC to perform medium work. Doc. 15, pp. 13-14.

At Step Two, the claimant must show that she has an impairment that significantly interferes with her ability to do basic work activities. See 20 C.F.R. § 404.1520(c).  Basic work activities are the abilities and aptitudes necessary to do most jobs such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; capacities for seeing, hearing, and speaking; understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting. 20 C.F.R. § 404.1521.

Plaintiff carries the burden of proving the severity of his impairments. *Allen v. Apfel*, 3 Fed. Appx. 254, 256 (6th Cir. 2001) (*citing Higgs v. Bowen,* 880 F.2d 860, 863 (6th Cir.1988)). While Step Two has been described as a "*de minimis* hurdle," the severity requirement can be

28

employed to screen out "claims that are 'totally groundless' solely from a medical standpoint." *Higgs*, 880 F.2d at 862-863 (citation omitted). A claimant's impairment will be construed as non-severe when it is a "slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work irrespective of age, education and work experience." *Farris v. Sec'y of Health & Human Servs.,* 773 F.2d 85, 90 (6th Cir.1985) (*citing Brady v. Heckler,* 724 F.2d 914, 920 (11th Cir.1984)).

Where an ALJ finds one severe impairment and continues with subsequent steps in the sequential evaluation process, an error at Step Two may not warrant remand.  *See Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987) (the Commissioner's failure to find claimant's cervical condition severe was not reversible error because the Commissioner did find a severe impairment and continued with the remaining steps in the sequential evaluation process)*; see also Anthony v. Astrue*, 266 Fed. Appx. 451, 457 (6th Cir. 2008) (relying on *Maziarz* when finding that, because the ALJ had found other impairments severe, the fact that some other impairments were found to be non-severe at Step Two was not reversible error).

Here, the ALJ found other impairments to be severe and proceeded with subsequent steps in the sequential evaluation process and, in assessing Hych's RFC, the ALJ took into account her allegations of back pain and treatment received for her pain.  Tr. 28-29.  Hych takes issue with the ALJ's determination that Hych had the RFC to perform medium work and argues that, had the ALJ found her back pain to be a severe impairment, the ALJ would not have found that she had the RFC to perform medium work.[17]  Doc. 15, p. 14.  However, in light of the lack of radiological tests showing compression fracture, disk herniation, or significant spinal stenosis, Hych has failed to demonstrate that, had the ALJ concluded that her back pain was a severe

---

[17] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds."  20 C.F.R. § 404.1567(c).

impairment, she would have restricted her to less than medium work.  Moreover, when

concluding that Hych had the RFC to perform medium work, the ALJ relied upon the opinions of

state agency physicians who opined that Hych could perform medium work.  Tr. 30, 74, 86.

Accordingly, even if it was determined that the ALJ incorrectly found Hych's back pain

to be a non-severe impairment, the ALJ proceeded to subsequent steps in the sequential

evaluation process and Hych has not shown that the ALJ failed to consider Hych's allegations

with respect to her back pain when assessing her RFC.  Thus, the undersigned recommends that

the Court find that reversal and remand is not warranted based on the ALJ's Step Two

determination.

**C.     The ALJ's determination that Hych had the RFC to perform medium work is
        supported by substantial evidence**

Hych contends that the ALJ's medium work RFC finding is not supported by substantial

evidence because the ALJ relied upon the opinions of the state agency physicians who did not

have the opportunity to review the extensive pain management records from Mercy St. Vincent

Medical Center, the opinion of Dr. Neumann or the functional capacity evaluation testing of

occupational therapist Marilyn Neuhausel.  Doc. 15, p. 14.  Although the state agency

physicians' opinions were rendered prior to Hych's pain management treatment at Mercy St.

Vincent Medical Center, the ALJ was not precluded from relying on or providing weight to those

opinions.  *See e.g. Helm v. Comm'r of Soc. Sec.*, 405 Fed. Appx. 997, 1002 (6th Cir. 2011)

(indicating that "[t]here is no categorical requirement that the non-treating source's opinion be

based on a 'complete' . . . case record).  Here, although the state agency opinions were rendered

prior to Hych's pain management treatment at Mercy St. Vincent Medical Center, the ALJ

reviewed and considered those pain management records.[18]  Tr. 29.

      Hych also contends that other evidence does not support a finding that she has the RFC to

perform medium work.  Doc. 15, p. 15.  For example, she states that her treating doctors

recommended physical therapy, trigger point injections, and SI injections[19] and never opined that

she could perform medium work.  Doc. 15, p. 15.    She also argues that that Dr. Ebraheim

indicated that she was unable to work for months because of her injuries.  Doc. 15, p. 15

(referencing Tr. 426, 434).  While her doctors never opined that she could perform medium

work, they also never opined that she not perform medium level work.  In fact, there were no

treating source opinions offered with respect to her physical abilities.  Even if Hych claims that

there is other evidence to support her position that she does not have the RFC to perform

medium work, since there is substantial evidence to support the Commissioner's decision, it

should not be overturned.  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

      Accordingly, based on the foregoing, the undersigned recommends that the Court find

that the RFC is supported by substantial evidence.

**D.**    **The ALJ presented and relied upon a VE response to a hypothetical question that accurately portrayed Hych's functional limitations**

      Hych claims that the ALJ posed only a general hypothetical question to the VE with no

mental health limitations or with only a quasi mental health restriction, i.e., "rare contact with the

general public; rare meaning less than occasionally but not completely precluded and occasional

contact with coworkers" and those limitations did not accurately portray mental limitations

---

[18] To the extent that Hych relies upon evidence from Mercy St. Vincent, Dr. Neumann and occupational therapist Ms. Neuhausel that she submitted to the Appeals Council to demonstrate that the ALJ's decision that Hych had the RFC to perform medium work is not supported by substantial evidence is, as discussed above, misplaced because that evidence was not before the ALJ and the Appeals Council denied review.  *See Cline*, 96 F.3d at 148.

[19] She asserts that, because of issues with the workers compensation, the recommended services could not be timely completed.  Doc. 15, p. 15.

contained in the opinions rendered by Dr. Kuna and Dr. Lewin. Doc. 15, p. 16 (referencing Tr. 60).

The Regulations make clear that a claimant's RFC is an issue reserved to the Commissioner and the ALJ assesses a claimant's RFC "based on all of the relevant evidence" of record.  20 C.F.R. § 404.1545(a); 20 C.F.R. § 404.1546(c).   "In order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence . . . the question must accurately portray a claimant's physical and mental impairments.  The hypothetical questions, however, need only incorporate those limitations which the ALJ has accepted as credible."  *Parks v. Social Sec. Admin.*, 413 Fed. Appx. 856, 865 (6th Cir. 2011) (citing *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010) and *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)).

With respect to Hych's claim that the VE hypothetical did not accurately portray the limitations as contained in Dr. Kuna's opinion, Hych fails to demonstrate error.  As noted above, the ALJ properly considered Dr. Kuna's opinion and since Dr. Kuna was not a treating psychologist his opinion was not entitled to controlling weight.  The ALJ gave little weight to Dr. Kuna's opinion.  Therefore, the ALJ's lack of inclusion of the marked limitations as found by Dr. Kuna in the hypothetical question presented to the VE was not error.

With respect to Hych's claim that the VE hypothetical did not accurately portray limitations contained in Dr. Lewin's opinion, Hych's claim is also without merit.  As found by the ALJ, Dr. Lewin, the state agency reviewing psychologist, opined that Hych had moderate difficulties in maintaining concentration, persistence, or pace but was capable of performing simple routine tasks and completing tasks in which changes were infrequent and could be explained.  Tr. 30, 97, 100-101.  The ALJ gave Dr. Lewin's opinions great weight.  Tr. 30.  A

review of the hearing transcript shows that the ALJ accounted for the limitations as found by Dr. Lewin in the hypothetical questions.  For example, contrary to Hych's assertion that the hypothetical question contained only a quasi mental health limitation relating to contact with others, the hypothetical question also contained a limitation of "work at an SVP of one to two where the pace of productivity is not dictated by an external source . . . which the individual has no control, such as an assembly line or conveyor belt."  Tr. 60.  Although the ALJ did not use Dr. Lewin's exact words in describing Hych's limitations, Hych has failed to demonstrate how the foregoing limitation of unskilled work (SVP 1 to 2) with pace restrictions does not adequately account for Dr. Lewin's findings.

As discussed above, the VE testimony upon which the ALJ relied was provided in response to a hypothetical question that accurately portrayed the limitations accepted by the ALJ as credible and contained in the RFC.  Thus, the ALJ's reliance upon the VE testimony was proper and constitutes substantial evidence.  *See Parks,* 413 Fed. Appx. at  865.  Accordingly, the undersigned recommends that the Court find Hych's request for reversal and remand based on her claim that the VE hypothetical questions did not accurately portray her limitations to be without merit.

**E.      Hych has failed to demonstrate that the ALJ's decision is not supported by substantial evidence**

In her final argument, Hych argues that the ALJ's decision is not supported by substantial evidence and that new evidence from Dr. Neumann and occupational therapist Ms. Neuhausel demonstrates that Hych was unable to function at even the sedentary level.  Doc. 15, pp. 17-18, Doc. 18, pp. 5-6.  Much of Hych's argument is a reiteration of her earlier arguments that have been addressed above and found unpersuasive and not a basis for reversal and remand.  Doc. 15, pp. 17-18.  Hych also argues that the Appeals Council's decision not to review the ALJ's

decision notwithstanding her submission of new evidence was insufficient.  Doc. 15, pp. 17-18.
As discussed earlier, since the evidence submitted to the Appeals Council was not before the
ALJ and the Appeals Council declined review, this Court may not review or consider such
evidence.  *See Cline*, 96 F.3d at 148.

To the extent that Hych claims that the ALJ erred when finding she had no past relevant
work, Hych has failed to demonstrate how, even if that were a factually incorrect finding,
remand is warranted based on such an error since the ALJ proceeded to Step Five of the
sequential evaluation process.  Hych's argument that reversal and remand is also warranted
because the ALJ failed to consider the entire medical record because the ALJ did not specifically
mention Hych's caudal epidural steroid blocks is likewise without merit.   Although not
discussed at length, the ALJ clearly considered and discussed medical records relating to Hych's
treatment at Mercy St. Vincent Medical Center.  Doc. 29.   Moreover, an ALJ is not required to
discuss every piece of evidence and a failure to mention specific information does not mean that
the ALJ did not consider the evidence. *Simons v. Barnhart*, 114 Fed. Appx. 727, 733 (6th Cir.
2004) (quoting *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)).

Since Hych has not demonstrated that the ALJ's decision is not supported by substantial
evidence, the undersigned recommends that the Court find Hych's final argument, which is
primarily a reiteration of her earlier arguments, without merit.

## VII. Conclusion and Recommendation

For the foregoing reasons, the undersigned recommends that the Commissioner's

decision be **AFFIRMED**.

Dated:  January 8, 2015

Kathleen B. Burke
United States Magistrate Judge

## <u>OBJECTIONS</u>

Any objections to this Report and Recommendation must be filed with the Clerk of
Courts within fourteen (14) days after the party objecting has been served with a copy of this
Report and Recommendation.  Failure to file objections within the specified time may waive the
right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir.
1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).